Edward J. Greenfield, J.
New York State and New York City are on opposite sides and in sharp conflict on this motion, each advocating laudable policy objectives which have come into collision. The State wants to build a public facility without let or hindrance, cutting through all “ red tape ”. The city wants to preserve existing historic buildings and landmarks, and save them from the bulldozer. Both focus on the same site.
The State of New York through its agencies, the Narcotic Addiction Control Commission and the Mental Hygiene Improvement Corporation, seeks to construct a narcotics addiction treatment facility in an area of the city known as Mount Morris Park, which has been designated by the New York City Preservation Commission as an historic district. A group of residents and home owners from the community seek to enjoin the State from demolishing a row of private homes in the historic district which they contend would effectively destroy the unity of the site and radically alter the characteristics of the neighborhood. The City of New York through the Landmarks Preservation Commission points out that this is the first action of this kind which has been brought, and joins in the application for injunctive relief. The area involved is the Mount Morris Park District in Manhattan, running westward from Mount Morris Park to Lenox Avenue, from 119th to 123rd Street. The buildings facing the park were built in the late 19th century, and consist of rows *129 of townhouses interspersed with architecturally notable churches. The area continues to have a remarkable homogeneity. The unbroken row of townhouses on Mount Morris Park West is one of the few remaining in the city, and has been found to be exceptional in character, quality and location. The row is even more exceptional when considered in the light of the crumbling decay which blights so much of the adjoining Harlem area.
In 1968, the State of New York was actively seeking to expand the number of facilities available for treatment of the increasingly serious and threatening narcotics addiction problem. To facilitate that objective, in that year the Legislature enacted the Health and Mental Hygiene Facilities Improvement Act (L. 1968, ch. 359). The act called for the construction of special units for the treatment of narcotics addiction, along with other problems of mental hygiene, and to assure that the required facilities be completed and ready for use as promptly as possible a public benefit corporation known as the Health and Mental Hygiene Facilities Improvement Corporation was created and empowered to construct the necessary physical facilities. The corporation was directed to act “in cooperation with the state, municipalities, and the New York state housing finance agency ” and “ in accordance with the health needs of the community ” (§ 2). The corporation was authorized to acquire real property by purchase or appropriation, to design and construct facilities, and to make them available for use under lease, license or conveyance.
In accordance with these powers, the State in November of 1968 exercised its power of eminent domain to acquire the buildings known as Nos. 1, 2, 3, 4, 5, 6, 7 and 8 Mount Morris Park West, between 120th and 121st Streets, for the purpose of demolishing those buildings and erecting a new narcotics addiction rehabilitation center on the site. Though title to the buildings was in the State, they remained untouched, and it was not until August of 1971 that the Health and Mental Hygiene Facilities Improvement Corporation contracted for the demolition of the buildings. At that time the designation of these buildings as part of an historic site by the Landmarks Preservation Commission was imminent, and as soon as workmen appeared on the site the residents and the citizens of the community brought on this proceeding, asking for a temporary injunction. The State of New York, Department of Mental Hygiene and the Narcotic Addiction Control Commission which were named as defendants, made a cross motion to dismiss the complaint for *130 failure to state a cause of action, lack of jurisdiction over the subject matter and lack of standingyby the plaintiffs to sue.
The questions of jurisdiction and standing may be disposed of briefly. The plaintiffs are residents, home owners and taxpayers in the area directly affected. The threatened demolition of buildings by the State directly affects the other residents of the neighborhood. Under those circumstances they have a direct stake in a suit affecting the character of the neighborhood. (Powelton Civic Home Owners Assn. v. Department of Housing and Urban Development, 284 F. Supp. 809; Norwalk Core v. Norwalk Redevelopment Agency, 395 F. 2d 920; Scenic Hudson Preservation Conference v. Federal Power Comm., 354 F. 2d 608.) In any event, the City of New York through its Landmarks Preservation Commission, while originally named as a defendant, has joined with the plaintiff community residents in asking for the injunction, and there is no question but that it is a proper party in a proceeding to attempt to preserve officially designated landmarks (New York City Charter, ch. 63; New York City Administrative Code, ch. 8-A).
As for the State’s contention that the only proper forum for the resolution of this issue is the Court of Claims rather than the State Supreme Court, the simple answer is that the jurisdiction of the Court of Claims is confined to claims of money damages against the State (Court of Claims Act, § 9), with the court’s equitable powers limited solely to those expressly set forth in the act or incidental to the enforcement of a claim for money judgment. (Tompkins v. State of New York, 33 Misc 2d 828; Tomlinson Constr. Co. v. State of New York, 26 Misc 2d 488, affd. 15 A D 2d 692; Mowers v. State of New York, 168 Misc. 651; Psaty v. Duryea, 282 App. Div. 94, affd. 306 N. Y. 413.) The act creating the Health and Mental Hygiene Facilities Improvement Corporation confers upon it the right to sue and be sued (§ 5, subd. 1). Such suits are not restricted to the Court of Claims, and the equitable relief sought here can be fashioned only by the Supreme Court of the State of New York. This court is the appropriate forum and has jurisdiction.
The contention is also raised that the real party in interest is the Health and Mental Hygiene Facilities Improvement Corporation which let the contract for the demolition of the building and not the other designated defendants. The corporation, as well as the State of New York, the Department of Mental Hygiene and the Narcotic Addiction Control Commission are all State agencies. The cross motion made on their behalf by the Attorney-G-eneral and the briefs submitted raised all the *131 points which the corporation would raise if it had been originally named as a party, since it too would be defended by the State Attorney-General. There being no possibility of prejudice, plaintiffs’ request for leave to add that corporation as a party defendant nunc pro tunc is granted. The power of the court to permit the addition of parties at any stage rather than have the action dismissed is clear. (CPLE 1003.)
Threshold considerations aside, the defendant State agencies contend that there is no power which can interfere with their unilateral determination to construct a particular facility in a given location and in a particular way. In the conflict of competing values, the State contends that the human considerations implicit in the narcotics crisis must override all other considerations, aesthetic, architectural, historic and communal desires. These latter values need not be considered contradictory. There are ways of harmonizing competing interests to afford basic satisfaction to all. It has been suggested that there might be possible alternatives to the proposed demolition and construction on Mount Morris Park West. Both the community and the Landmarks Preservation Commission would be satisfied if the facades of the existing buildings were left undisturbed, while the interiors were used for narcotics rehabilitation programs. Alternatively it has been suggested that there were a number of nearby sites, vacant or in a state of decay which could appropriately be used for a narcotics addiction facility. The State has steadfastly refused to consider such possible alternatives, and when this court suggested on oral argument that a conference to consider alternatives might be productive, such a suggestion was flatly refused. The representative of the Attorney-General’s office said, “We have a statute, and we don’t have to talk to anybody! ” This stiff-necked position is premised upon one section of the Health and Mental Hygiene Facilities Improvement Act which was designed to expedite the attempts to build facilities rapidly and to cut through all possible red tape. The section is section 9 (subd. 1, par. e) of the act (L. 1968, ch. 359, as amd. by L. 1969, ch. 1033, § 6; L. 1970, ch. 607, § 10) which reads: “Ño county, city, town or village shall have power to modify or change the plan or specifications for mental hygiene facilities to be constructed, reconstructed, réhabilitated or improved pursuant to this act, or the construction, plumbing, heating, lighting or other mechanical branch of work necessary to complete the work in question, nor to require that any person, firm or corporation employed on any such work shall perform any such work in any other or different *132 manner than that provided by such plans and specifications, nor to require that any such person, firm or corporation obtain any other or additional authority or permit from such county, city, town or village as a condition of doing such work, nor shall any condition whatever be imposed by any such county, city, town or village in relation to the work being done pursuant to this act, but such work shall be under the sole control of the supervising architect or engineer in accordance with the drawings, plans, specifications and contracts in relation thereto; and the doing of any such work for the corporation by any person, firm or corporation in accordance with the terms of such drawings, plans, specifications or contracts shall not subject such person, firm or corporation to any liability or penalty, civil or criminal, other than as may be stated in such contracts or incidental to the proper enforcement thereof. ’ ’
Defendants urge that this section precludes the City of New York through its Landmarks Preservation Commission from interfering in any way with the demolition and construction of the planned facility.
Faced with this sweeping statutory grant of powers, plaintiffs argue that there is a paramount Federal statute which must prevail, the United States Model Cities Act (U. S. Code, tit. 42, § 3301 et seq.). That act provides for Federal funding of municipal programs to rebuild and revitalize designated urban renewal areas and places an affirmative duty on the Secretary of Housing and Urban Development to encourage cities drawing up such programs to 1 ‘ maintain, as appropriate, natural and historic sites ” (U. S. Code, tit. 42, § 3303, subd. [b], par. [3], subpar. [B]). It is urged that since the Mount Morris Park West houses are within the Milbank-Frawley urban renewal area, for which the Housing and Urban Development Agency has drawn up a model cities plan, any plan to demolish existing historic buildings and to erect a proposed narcotics treatment center would have to be submitted to the Housing and Development Administration for approval. The court cannot accept this contention. It is clear that the Model Cities Act, in setting forth guidelines to be considered in passing on proposed plans, merely indicates what is desirable and does not invest with the force of law the recommendation for consideration of historic sites. The Model Cities plan for the Milbank-Frawley area has not yet been approved by the Department of Housing and Urban Development, and there is no basis for holding that pending approval of an overall plan, all building activities in the area are immutably frozen. *133 The State as sovereign still has the power to act by eminent domain, provided that there are no other restrictions imposed.
Section 96-a of the General Municipal Law, which was enacted at the same legislative session which passed the Health and Mental Hygiene Facilities Improvement Act, empowered municipal corporations, counties, towns and villages to provide ‘ ‘ by regulations, special conditions and restrictions for the protection, enhancement, perpetuation and use of places, districts, buildings, structures, works of art, and other objects having a special character or special historical or aesthetic interest or value. Such regulations, special conditions and restrictions may include appropriate and reasonable control of the use or appearance of neighboring private property within public view, or both.” Thus we are confronted with the unlikely anomaly that the Legislature, on one hand, has created in municipalities the power over and beyond the zoning laws to preserve designated landmark areas, and on the other hand granting extraordinary powers to a State public benefit corporation to construct a mental hygiene facility, even if it means the tearing down of historic or esthetic buildings singled out as landmarks.
The State, as sovereign, may have absolute and undiluted power except for those limitations which are imposed by a Constitution to protect and safeguard the rights of its people. It may confer some of its powers upon the municipalities, counties, towns and villages which are its creatures — since it may be omnipotent but it is surely not omniscient — the underlying basis for “ home rule ”. That delegated power is in most cases the power to act locally with respect to private persons and interests. The State may impose restrictions on the exercise of its own powers by granting to its subdivisions in any field exclusivity, veto power, or the right of consultation. Rare indeed in a constitutional government of checks and balances and limited powers is the claim made by a State of the unrestricted right to proceed entirely as it wills — in total disregard of all persons, entities and considerations other than its own pressing needs. When such a claim is made, a court of law and equity must perforce view it with some degree of skepticism, and examine with close scrutiny the alleged grant of undiluted power. Such scrutiny of the statute relied on by the State in this case indicates that some reasonable restrictions are indeed imposed.
The very statement of legislative design and purpose embodied in the Health and Mental Hygiene Facilities Improvement Act includes the declaration that the Health and Mental Hygiene *134 Facilities Improvement Corporation should be empowered not to override but ‘ ‘ to aid cities and counties, at their request, to provide new and improved community mental health and retardation facilities ” (§ 2). The power conferred on the Health and Mental Hygiene Facilities Improvement Corporation to provide for timely construction of facilities is to be exercised ‘ ‘ in cooperation with the * * * municipalities ” (§2).
That general declaration as to the desire to aid cities and the necessity of co-operation with them is spelled out in section 9 (subd. 1, par. b), which provides: “b. The trustees of the corporation shall prepare or cause to be prepared for the state housing finance agency, within the amounts appropriated therefor or otherwise available, the building plans, the exterior drawings or models displaying the architectural concept of each mental hygiene facility thereafter to be constructed, reconstructed, rehabilitated or improved, and the detailed plans and specifications for all such construction, reconstruction, rehabilitation and improvement work to be performed, all of which shall be subject to the separate approval of the commissioner of mental hygiene and, in the case of community mental health and retardation facilities, of the governing body of the city or county or of such officer, department, agency or community mental health board as may be designated by such governing body for the purpose of such approval.” (Emphasis supplied.)
A community mental health and retardation facility is defined in subdivision 2 of section 3 (L. 1968, ch. 359, as amd. by L. 1970, ch. 607, § 3) to include a Narcotic Addiction Control Commission Facility. Accordingly, it would appear that all plans and specifications for the construction of a Narcotic Addiction Control Commission Facility must be approved by the ‘1 governing body of the city or county or of such officer, department, agency or community mental health board as may be designated by such governing body for the purpose of such approval. ’ ’ This requirement of local consultation and approval makes eminent good sense, since such a project directly affects the locality. The prerequisite of initial local approval is not in essential conflict with paragraph e of the same section which is relied on by the State, since that is designed to cut through other red tape after the project has been agreed on. The statutory plan appears to be that once local approval is given to go ahead with a facility, then local zoning laws, building codes, permit requirements, inspections and the like could not interfere with the work. Once approved, there is no further power to modify or change specifications under paragraph e, and no condi *135 tions may be imposed 1 ‘ in relation to the work being done ’ ’ (italics supplied), such work, once undertaken, being under the sole control of the supervising architect or engineer.
There being no showing that the Health and Mental Hygiene Facilities Improvement Corporation ever obtained the necessary approval from the governing body of the city or its duly designated agency, as required by the statute, and the city being in vigorous opposition to the projected demolition and construction, ample basis appears for halting the imminent destruction of officially designated landmarks. Perhaps now the State agencies concerned will have the time for sober second thought and the realization that the arrogant assertion of unrestricted power was without justification. How vain and foolish it is to proceed headlong on a course once embarked upon, giving no heed to other voices, refusing all alternatives and all consultation— ironically insisting on the demolition of sound and beautiful buildings which are historic landmarks from a less hectic era, at the very moment when the State budget is being cut back, existing narcotics addiction control facilities are being closed down, and there is no assurance of sufficient operating funds for the pitifully few that might still be operating, let alone additional funds for the staffing and running of a wholly new facility. How many vacant lots stand gaping as mute testimony to enthusiasm for demolition outpacing capacity to build?
Regretfully, the court has no, power to enjoin the State to follow the course of wisdom. The court does have the power to enjoin the State from following an illegal course of action.
Sufficient reason appearing therefor, the motion for a temporary injunction to halt the proposed demolition is granted. Settle order providing for the joinder of the Health and Mental Hygiene Facilities Improvement Corporation as a party nunc pro tunc and for an amendment of the caption to reflect the proper status of the New York City Landmarks Preservation Commission.